## Hatfield et al. v. Commonwealth.

(Decided Oct. 29, 1937.)

A. T. W. MANNING and CHAS. N. HOBSON for appellants.

HUBERT MEREDITH, Attorney General, and W. OWEN KEL-LER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

Appellants, with John Downey, were indicted by the Clay county grand jury on a charge of robbery with and by the use of deadly weapons as denounced by section 1160, Ky. Stats. 1936. When the case was called for trial, Downey moved for and was granted severance, and the Commonwealth elected to try appellants. Upon submission, after proof and instructions, the jury returned a verdict of guilty, assessing a penalty of life imprisonment against each of the accused. Their joint motion for new trial was overruled; judgment entered according to the verdict; and from this order joint appeal is prosecuted.

In support of their motion for a new trial appellants tendered five or more grounds. On appeal here it is only urged that the court below erred in not allowing a new trial, because (1) the verdict of the jury is not supported by the evidence; (2) the court gave erroneous and highly prejudicial instructions to the jury, and lastly, the Commonwealth's attorney was guilty of gross misconduct in his final argument to the jury.

The robbery and assault occurred around 11 o'clock

on the night of October 12, 1936. Finley Smith, then about 70 years of age, operated a small store at the mouth of Mud Lick in Clay county. He lived some distance from the store, but he and his son Osba, aged 23, slept in the rear of the store. They had retired, and at a time not exactly fixed, but around 11 o'clock, some one called, "Hello Finley, I want some flash light batteries and bulbs." The father told the boy to get up and get the batteries. The boy got up, lighted a lamp, and opened the door. Two men came into the store, identified later as Tommy Hatfield and Henry Smith. The boy went behind the counter and he and Smith began "dickering" about the proposed purchase. While this was going on, Tommy Hatfield went to the old man's bed, jumped on him and struck him, with what the old gentleman thought was a black-jack, stunning him for a brief time. Henry Smith asked for some tobacco, and Osba turned to get it, but, when he heard what was happening to his father, he turned around and when he did so faced a pistol, as he says, in Smith's hand. The boy started from behind the counter and walked toward the bed. Smith said, "be still or I'll kill you." The boy said, "don't shoot me," and at that point the gun fired, a bullet striking the boy in the breast and wounding him severely. The boy begged him not to shoot any more and fell on the floor towards the front, and Smith then started toward the bed, and the boy thought he could get out the front door. Smith struck him and advised him not to go out the door, made him go to the rear of the store, and there Henry Smith and Tommy Hatfield went through the clothing of the father and son, obtaining about $75 and a government check. The boy succeeded in escaping in some way and ran out the door, where he was met by another man who caught him and threw him back in the house. He and this man fell, and as the boy raised up there was still another man with a gun. He identified this man as "Red" Letcher Hatfield. Smith then walked behind the counter and got some shells. Smith and Tommy Hatfield then walked to the door, and "were talking to the other fellows."

About this time the father jumped up from the bed, and Letcher Hatfield jumped in the door; went to the bed and said, "Lay down old man or I will shoot you." The old man begged him not to shoot, and Tommy Hatfield and Smith tied both the old man and the boy to the bed, using some new rope which was in the store,

and a belt which they took from Osba. They also gagged Osba by tying a cloth around his mouth. They then blew the light out and left by a back door, walking down the road. The story as told so far is a combination of the testimony of the father and son.

The three appellants denied that they were in or near the Smith store on the night of the robbery and assault. Letcher Hatfield was the owner of a green International ½-ton "Pick Up" truck. He says that on the day of the robbery he was engaged in hauling some mine lumber from his place to Bill and Ed White's on Horse creek, a distance of about four and a half miles. He and his boy left home with a load of timber about 2 p. m. On this trip they had tire trouble which delayed them something over two hours, but they finally delivered the load about 6 o'clock. When they left on the return trip, Henry Ike Smith joined them. They stopped on the way home at one or two places, and a delay was also occasioned on this return trip. On Reed's hill, about three-fourths of a mile from the Hatfield home, the truck overturned, the result of which was to injure the boy's leg. The boy caught his leg in the door in some way, and when the truck turned over he was caught under it. Some travelers assisted in righting the truck, and one took the boy in another truck to take him home, but he was finally transferred to the Hatfield truck, and the three appellants resumed their journey towards Hatfield's home, and on the way let Smith out near his home.

It appears from the record that the Hatfields lived some distance out on a road which left the road which led on toward the Smith store. The Hatfields say that they arrived home about 8:30 p. m., and never left that night. They also insist that the truck was not moved after their arrival at home, and in this they are corroborated to some extent by witnesses who lived on the side road going up to the Hatfield home. They say that they either heard or saw the Hatfield truck go up the side road around 8 o'clock or thereafter, but none heard or saw it later that night, which testimony would be significant, if any proof showed, or tended to show, that such persons as robbed the Smiths went to or left the store in a truck. The proof tends to show that they did not come or leave in a truck.

Letcher Hatfield said that he was never at the Smith store in his life, and had no acquaintance with Finley

Smith or the son. Without repeating the testimony of Smith and Tommy Hatfield, it may be said that their evidence is in accord with the details given by Letcher Hatfield. They both denied the charge, and further testified that they had never been in Smith's store. Tommy did not know either of the Smiths; Henry Smith had seen Finley Smith several times and had seen Osba several times "up and down the road." All the persons involved lived, as best we can gather from the record, within a radius of four and a half to five miles. Henry Smith lived within three-fourths of a mile of the Hatfields, and Downey (codefendant, but not on trial) lived about 200 yards from the Hatfield home.

Counsel's contention is based first on the alibi, which, it is urged, is lent more strength because it is said the identification of appellants was weak; that the condition of the two Smiths who were assaulted was such that their statements as to who the parties were are not to be given value.

An alibi is efficacious, and should be a complete defense when all the links in the chain are complete. If there is an incomplete chain, it fails. In this case there is no sort of doubt that the alibi is complete up to the point where the accident occurred to Hatfield's truck on Reed's hill; perhaps it is complete up to 8:30 p. m., when the parties went to their respective homes. After that it is not, except for appellants' testimony alone. It may be noted, not for any purpose of criticism, that at Hatfield's home during that evening there were his daughter and son, and some small children. At Henry Smith's home there were some children, yet there is no proof, save appellants, on the one important question.

Thus we are presented with an issue of fact where two witnesses positively swear that appellants were at the store, and the three appellants swear directly otherwise. It seems to us this is a question peculiarly addressed to a jury. We do not consider the identification lacking in probative strength. On the question of identification we have only to quote parcels of the testimony of Finley Smith and the son.

Finley Smith:

"Another one jumped in the store, Red Hatfield.

"Q. Is there any doubt that it was Red Hatfield

that jumped in the store? A. No sir, it was Red Hatfield."

"Q. Show the jury what happened to your body. Is that the defendant here, Henry Ike Smith? A. Yes sir.

"Q. Is there any doubt in your mind but that was him? A. No sir, not a doubt, that was Henry Ike Smith, I knowed him. I seen his face when he run behind the counter and pulled out the money drawer. The light was on this side and he was on this side. They started to go out the door, him and the boy did.

"Q. Which boy? A. That boy there, Tommy Hatfield."

Witness' said that at one time he was in jail with Letcher Hatfield; the latter denying it, but admitted having been in jail about fourteen years prior to that time. On cross-examination he emphasized that he knew Henry Ike Smith; had seen him frequently in the last 2 or 3 years. Witness did not know Tommy Hatfield's name, but recognized him when he saw him around the courthouse.

Osba Smith:

"Q. Tell the jury who it was that came in there that night. A. Henry Ike Smith was one of them.

"Q. Tell the jury whether or not this man was one of them. A. Yes sir, that man right there was one of them.

"Q. Do you know Tommy Hatfield? A. Right over there, he stands. He is one of them.

"Q. Point out Henry Ike Smith. A. That is him over there.

"Q. Is there any doubt in your mind that it was Henry Ike Smith? A. No sir, that is the man. * * * This Hatfield boy, Tommy Hatfield, asked my daddy what flour was worth. * * * Henry Ike Smith was above the heating stove. * * *

"Q. Is that the man that done this shooting? A. Yes sir, that is the man right there. * * *

"Q. Who was this other man? A. Red Letcher Hatfield, there he sits. * * *

"Q. Who tied you and your daddy? A. Henry

Ike Smith and Tommy Hatfield, they were both there together.''

On cross-examination witness said he had been acquainted with Henry Ike Smith for 3 years before the night in question; that he had seen him "plenty often." He did not know Letcher Hatfield before that night, nor had he seen Tommy, but he had no difficulty in recognizing and pointing them out, and was very definite in his statements that these were the men who had robbed and assaulted him and his father, an occurrence most likely to leave impression.

Upon submission the court instructed the jury that if they should believe from the evidence beyond a reasonable doubt that the defendants, or either one or more of them, robbed Finley Smith in the manner set out in the indictment, which, as we view that writing, correctly followed the statute in every detail, they should find them guilty. There was interpolated in the first part of the instruction the following language: "With the felonious intention then and there to convert the same (property) to their own use and benefit or to the use and benefit of John Downey." This was followed by another sentence in the same instruction, which advised the jury that they might find the defendants, or any one of them, guilty, if all or any one of them were present at the time and feloniously aided, assisted, advised, or encouraged John Downey, or any one of the others, in perpetrating the crime.

It is vigorously urged that so much of the instruction as advised the jury that they might convict, if any one of the three or all of the appellants committed the robbery with the intent to convert the proceeds to their use or the use of John Downey, and that they might convict appellants, or any of them, if they or any of them were present aiding Downey, prejudiced the rights of appellants. This objection is predicated on the assertion that there is no proof connecting Downey with the robbery and assault, and this assertion may be taken as true, since from a reading of the record it is not shown that Downey was with appellants that night, or during the day. It is to be noted that Osba Smith testifies that there was a fourth man in the party who remained outside the store, but he did not know him.

It is argued that an instruction must be based both on the indictment and the evidence. We may eliminate

any discussion of the propriety or impropriety of the instruction as based on the indictment, since Downey was jointly indicted as principal, though not on trial because of his successful motion for severance.

It may be admitted for the sake of discussion that the court under the evidence produced should have left out of the instructions any reference to John Downey, though he was named in the indictment, not as an accessory, but as principal. It does not, however, necessarily follow that the instruction was prejudicial to appellant's rights. We are familiar with that series of cases in which we have consistently held that an instruction not based on evidence should be omitted. Pegram v. Com., 242 Ky. 465, 46 S. W. (2d) 780; Luttrell v. Com., 250 Ky. 334, 63 S. W. (2d) 292; Muncy v. Com., 265 Ky. 730, 97 S. W. (2d) 606; and Com. v. West. (Ky.) 113 S. W. 76, not elsewhere reported.

We note that on this particular point the West Case has not been cited in any other case. We take the position that, even though the court should not have given that portion of the instruction which related to any action of Downey, yet such error could not reasonably have prejudiced the rights of appellants, in view of the first part of the instruction, which related only to the activities of these appellants. In the West Case, West was charged as an accessory of Lewis and Johnson. The court in that case permitted the jury to convict West if either of the other parties had committed the offense. Here the court did not base the right of the jury to convict appellants if Downey alone committed the crime, but only in the event they were present aiding or abetting him.

However, we need not draw distinctions between the instructions cited in the West Case (and others cited) and the one here in question. In quite a number of cases wherein we have held that an instruction is erroneous, we have said it does not necessarily follow that the giving thereof was prejudicial. Davis v. Com., 193 Ky. 597, 237 S. W. 24, 23 A. L. R. 1551; Daniel v. Com., 198 Ky. 158, 248 S. W. 511. These cases so holding are based on the provision of our Cr. Code Prac. sec. 353, which provides:

"A judgment [of conviction] shall be reversed for any errors of law (appearing on the record, when upon consideration of the whole case, the court

is satisfied that the substantial rights of the defendant have been prejudiced thereby).''

The argument of counsel to the effect that there was not a scintilla of evidence to connect Downey with the robbery is sufficient ground upon which we may base our conclusion that the substantial rights of the appellants could not have been prejudiced by the instruction. If this were the only instruction given, we might be compelled to hold error. We cannot conceive how any jury of ordinary intelligence could have even assumed that Downey was present aiding and abetting.

There is no complaint that the intsruction as given did not contain sufficient advice under which the jury could convict if they believed beyond a reasonable doubt that appellants committed the crime. And, as we view the case, there was only one issue of fact to be considered: Were the appellants present at the Smith store on the night in question? They say they were not. The father and son say they were. If they were there, can one doubt that an issue is presented on the question as to whether or not they assaulted and robbed? We think not, nor could the jury have thought otherwise. A case in point here is Wooten v. Com., 245 Ky. 266, 53 S. W. (2d) 557. We are clearly convinced that, even though the court should have framed his instruction otherwise, no prejudicial error was committed in the respect above discussed.

In his closing argument the Commonwealth's attorney said:

"You have got to send these men to the electric chair or brand Finley Smith and his boy Osba liars. Luce Clark did it and I don't believe you, Robert Clark, will be any longer in doing it than your kinsman, Luce Clark was."

At the outset may we say that we do not look upon the statement of the Commonwealth's attorney as being fully within the realms of propriety. But we have said:

"There are numerous cases which give recognition to the impropriety of such argument yet hold that it does not constitute such prejudicial error as will warrant a reversal."

Underwood v. Com., 266 Ky. 613, 99 S. W. (2d) 467, 470; Hall v. Com., 207 Ky. 718, 270 S. W. 5; Moore v. Com.,

223 Ky. 128, 3 S. W. (2d) 190. Compare the language here indulged by the attorney and that used in Young v. Com., 263 Ky. 683, 93 S. W. (2d) 10; Shepherd v. Com., 236 Ky. 290, 33 S. W. (2d) 4; Morgan v. Com., 242 Ky. 116, 45 S. W. (2d) 850; Shelton v. Com., 255 Ky. 745, 75 S. W. (2d) 494; Cole v. Com., 260 Ky. 554, 86 S. W. (2d) 305; Miller .v. Com., 240 Ky. 346, 42 S. W. (2d) 518; Kirk v. Com., 247 Ky. 666, 57 S. W. (2d) 658; King v. Com., 253 Ky. 775, 70 S. W. (2d) 667.

There was sufficient proof to take the case to the jury, and the jury had the right to believe, on the questions of identity or alibi, either of the two classes of witnesses, though the evidence materially conflicted. Strader v. Com., 263 Ky. 88, 91 S. W. (2d) 1003; Jordan v. Com., 260 Ky. 11, 83 S. W. (2d) 855. We have concluded that neither the instruction complained of nor the language used by the Commonwealth's attorney in his argument were of prejudicial harm.

Judgment affirmed.